UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO.: 4:07CV-74-M

RICK BOZE, STEVE CRICK, and
RANDALL LARKINS                                                      PLAINTIFFS

v.

GENERAL ELECTRIC COMPANY                                             DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court upon motions by the defendant, General Electric Company ("GE"), for summary judgment [DN 26, 27, and 28] and to strike [DN 35, 36, and 37].  Fully briefed, these motions are ripe for decision.

## I.  INTRODUCTION

At relevant times, the plaintiffs were hourly production employees at GE's Madisonville, Kentucky plant involved in the manufacturing of parts used in military aircraft.  In late 2000, seven of the plaintiffs' co-employees filed a *qui tam* action on behalf of the United States alleging that GE knowingly sold defective aircraft parts to the government in violation of the False Claims Act ("FCA").[1]  In addition to the *qui tam* action, the government convened a grand jury to investigate whether GE's alleged actions were criminal.  The plaintiffs assisted in this investigation primarily by testifying before the grand jury.  The grand jury was eventually dismissed without any indictments being issued and the civil claim was settled.  The plaintiffs contend that GE retaliated against them for engaging in these protected activities.

---

[1]        The FCA, 31 U.S.C. §§ 3279 *et seq*, provides a civil remedy against those that defraud the United States government.

## II.  SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

## III.  DISCUSSION

In addition to various supplemental state law claims, the plaintiffs allege False Claims retaliation in violation of 31 U.S.C. § 3730(h).

### A.  FALSE CLAIMS RETALIATION

"The FCA protects 'whistleblowers' who pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government."  McKenzie v. BellSouth

2

Telecomms., Inc., 219 F.3d 508, 513 (6th Cir. 2000) (citation omitted).  In pertinent part, the FCA provides that

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2008).[2]  Therefore, to establish a claim of retaliation, "the plaintiff must prove 1) []he was engaged in a protected activity; . . . 2) that h[is] employer knew about it[;]" and 3) "that the employer [] discharged or otherwise discriminated against the employee as a result of the protected activity."  McKenzie, 219 F.3d at 514.[3]

### 1.  Adverse Employment Action

To survive a motion for summary judgment, the plaintiffs must establish that GE made an employment decision that was materially adverse to the plaintiffs.  An employment decision does not meet this standard unless the decision "would be sufficient to constitute an adverse employment action under Title VII."  Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 847-48 (9th Cir. 2002).  Accordingly, employment decisions are only materially adverse "if [they are] reasonably

---

[2]       This statute was recently amended by § 4(d) of the Fraud Enforcement and Recovery Act of 2009.  See Pub. L. No. 111-21, 123 Stat. 1617 (2009) (enacted May 20, 2009).  Section 4(f) of the Act provides that the amendment "shall apply to conduct on or after the date of enactment . . . ."  As the alleged retaliation occurred prior to this amendment, all references in this Memorandum Opinion to the FCA are to the act as it existed at the time of the alleged retaliatory conduct.

[3]       Although GE does not concede that the plaintiffs engaged in a protected activity or that GE knew of that protected activity, it assumes, for purposes of its motion, that testifying before the grand jury was a protected activity and that it knew about that testimony.  The Court similarly assumes, for purposes of this Memorandum Opinion, that the plaintiffs have satisfied the first two elements of their prima facie case of retaliation.

3

likely to deter employees from engaging in activity protected" by the False Claims Act. Id. at 848 (citation omitted); cf. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (for purposes of Title VII, conduct of an employer is retaliatory if "a reasonable employee would have found the challenged action materially adverse . . . ."). Tangible employment actions, such as discharges, demotions, or undesirable reassignments certainly meet this standard. See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

However, the FCA, like Title VII, "does not set forth 'a general civility code for the American workplace.'" White, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Engaging in protected activity "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. Therefore, not "every low evaluation or other action by an employer that makes an employee unhappy or resentful [is] considered an adverse action," otherwise "[p]aranoia in the workplace would replace the prima facie case as the basis for a . . . cause of action" for retaliation. Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999). If courts were to find these types of employment decisions to be materially adverse, "we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit; a simple statutory prohibition against retaliation would be turned into a bizarre measure of extra protection for employees who–though they might genuinely need counseling–at one point complained about their employer." Sweeney v. West, 149 F.3d 550, 557 (7th Cir. 1998); see also White, 548 U.S. at 68 ("personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable . . . .") (quotation omitted).

But if an employment action arises above this type of "trivial conduct" and reaches the level

4

of material adversity, a claim for retaliation does not fail merely because the employment action was unrelated to the terms and conditions of employment. White, 548 U.S. at 64. Similarly, a claim for retaliation does not fail merely because the retaliation was carried out by co-workers and not the employer. See Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 346 (6th Cir. 2008) (recognizing claims against an employer for coworker retaliation in the Title VII context). "To hold otherwise would allow an employer to recruit or permit employees to carry out retaliatory acts with impunity." Id. But an employer should only be held responsible for the retaliatory acts of the plaintiff's co-workers in "appropriate circumstances." Under Title VII, the Sixth Circuit has found those appropriate circumstances to exist where "(1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." Id. at 347. Although this is not a Title VII retaliation case, the Court finds that these same principles apply to the plaintiffs' claim of retaliation under the FCA.

Larkins

To support his claim that GE took adverse employment action against him for testifying before the grand jury,[4] Larkins primarily relies upon various "Form As" he submitted to GE in which he reported alleged retaliatory actions taken by the company. A "Form A," also known as an Initial Report of a Company Integrity Concern, permits GE employees to privately report employment

---

[4]     Larkins testified before the grand jury on September 3, 2003.

5

issues to management.   In his first Form A, submitted to GE on February 9, 2004, Larkins complained of "retaliation, harassment possibly due to complainant being federal grand jury witness". (Pls.' Ex. 7 at 1.)  In an attached letter, Larkins complained that his supervisor, Chuck Harper, encouraged him to "get the [production] numbers up," and that Harper apparently compared Larkins' production numbers to those of an employee who obtained higher production numbers the day before.   Larkins does not contend that he was demoted, suspended, or had any reduction in pay as a result of this incident.   Furthermore, there is no record evidence to suggest that this was anything more than a simple "nudge" or "admonition" by a supervisor.   Harper's conduct simply does not rise to the level of an employment decision actionable under the FCA.  See Sweeney, 149 F.3d 550 at 557.

On April 15, 2004, Larkins complained to William Ainsworth, a cell leader,[5] about Ainsworth's presence at the GE plant during off shift hours.  It was not a customary practice for cell leaders to work during the off shift hours when Larkins generally worked.   According to Larkins, the presence of these cell leaders made him feel intimidated causing him "physical nervous problems."  However, the added presence of cell leaders at the plant during off shift hours does not constitute an adverse employment action.   This is especially true where there is no evidence that these cell leaders took any action against Larkins or in any other manner treated Larkins differently than the other off shift employees.   This was merely a minor annoyance that all off shift employees had to deal with.

Another incident involved an attempted break-in to Larkins' assigned toolbox.   When

---

[5]   A cell leader is a GE employee who "support[s] the shop, i.e. helps Coordinators [and] employees . . . ." (Pls.' Ex. 9.)

Larkins returned to work after testifying before the grand jury, his toolbox was damaged.  He informally reported the damage to his supervisor who had the toolbox repaired.  The type of damage done to Larkins' toolbox was not uncommon at GE.  And where there was only damage to the toolbox and no property stolen, GE did not typically perform an investigation.  Larkins was under the impression that GE would perform an investigation.  On April 19, 2004, he complained to management about the lack of an investigation and asserted that the toolbox break-in was the result of his testimony before the grand jury.  Subsequently, GE performed an investigation and concluded that no evidence existed to suggest that the unknown perpetrator targeted Larkins because he was a grand jury witness.  However, as a result of Larkins' complaint, GE determined that its policy regarding toolbox vandalism was inadequate and implemented a new provision in its security manual for investigating reports of property loss.  Other than conclusory allegations that this vandalism was the result of retaliation, Larkins has presented no evidence that the tampering was done at GE's direction or by Larkins' supervisors.  And to the extent another employee may have been retaliating against Larkins for testifying before the grand jury, GE is not responsible for such actions because its response to Larkins' complaint did not manifest indifference or unreasonableness under the circumstances.  Cf. Hawkins, 517 F.3d at 340 (an employer is not liable for the retaliatory acts of employees where the employer makes a reasonable attempt to prevent and correct the problem of harassing behavior).

### Threats Against Larkins, Boze, and Crick

According to the plaintiffs, they were interviewed by a local newspaper regarding the grand jury proceedings.  The plaintiffs were identified in an article that appeared in the newspaper on January 21, 2005.  (Pls.' Ex. 19.)  Almost immediately after the article was published, there was

tension at the GE plant between the plaintiffs and their co-workers.  So much so, that rumors of threats were spreading around the plant.  On January 25, 2005, Larkins reported these threats to management.  He told GE that "he had been warned by a friend that people had told him 'that they were going to get him.'"  (Pls.' Ex. 20.)  Larkins would not tell management the name of the friend who informed him of these threats because the friend did not want to get involved.  The other plaintiffs also notified GE of their safety concerns.

GE performed an investigation.  Other potential threats against the plaintiffs were reported and discovered by GE during this investigation.  When interviewed during the threat investigation, an employee, David Palmer, told GE that employees were upset with the plaintiffs and that "people could hurt him because of this."  (Pls.' Ex. 27.)  Another employee, Steve Hines, informed those investigating the threats that "he overheard a male voice, in a group of employees, on the way to his work area - after break - state that 'we should pull money together to hire a hit man.'"  (Id.)  Hines stated that he did not know who made the statement.  In response to these threats, the plaintiffs requested that they be provided a parking space near the security station.  GE management complied with their requests.  And as a result of their investigation, GE concluded:

> The Company has responded to the requests of Randall Larkins, Rick Boze and Steve Crick by offering a parking space that is under surveillance by our security team.  Secondly, the company has also increased security to ensure that the employees are not exposed to a hostile and harassing work environment. . . . As for claims of harassment and/or death threats being made towards any of the above employees, no specific threats and/or death threats were offered nor found during the investigation.

(Id.)

Because the plaintiffs do not contend that these threats were made at the direction of GE or its supervisors, GE can only be liable for the retaliatory actions of its employees if GE's response

to the threats manifested indifference or unreasonableness under the circumstances.  Cf. Hawkins, 517 F.3d at 340.  However, GE provided plaintiffs precisely what they requested–a parking spot near the guard's station.  GE also allowed Larkins to keep his toolbox near the coordinator's office and assigned guards to monitor the plaintiffs for a two to three week period after the threats were made.[6] No reasonable jury could find that GE's actions were indifferent or unreasonable under the circumstances.

Spying on Larkins, Boze, and Crick

Each of the plaintiffs contend that GE spied upon them outside of the workplace and that GE did so in retaliation for them testifying before the grand jury.  However, the plaintiffs have presented no evidence that GE was in any way involved in the surveillance of the plaintiffs.  The extent of the plaintiffs proof in this regard comes from their brief:

> They were all being followed by the same vehicle, in town, out of town, and all the way to Bowling Green and back.  Who else would be interested in knowing what the plaintiffs were doing?  Only GE comes to mind.  It is no coincidence that all three men were followed by the same vehicle at different times.

(Pls.' Resp. Br. at 33.)  GE denies its involvement in this surveillance.  And the plaintiffs' conclusory allegations notwithstanding, they have presented no more than a "metaphysical doubt" as to GE's involvement.  This is insufficient to survive a motion for summary judgment.  See Matsushita Elec. Indus. Co., 475 U.S. at 586.

Other Employment Actions

As discussed in more detail below, the plaintiffs contend that other employment decisions made by GE constitute adverse employment action.  Assuming, *arguendo*, that such actions are

---

[6]     As subsequently discussed, the plaintiffs argue that GE had guards follow them around, not to provide security, but to monitor and log their every move.

materially adverse, the defendant is nonetheless entitled to summary judgment because the plaintiffs have failed to establish a causal connection between these actions and the plaintiffs' protected activities.

### 2. Causal Connection

It is not enough for a plaintiff to show that he engaged in a protected activity and that an adverse employment action was subsequently taken by his employer.  Instead, the plaintiff must also prove that the adverse employment action was taken because he engaged in a protected activity.  The plaintiffs, who acknowledge that they have presented no direct evidence of retaliatory intent, attempt to establish an inference of retaliation through indirect evidence under the familiar McDonnell Douglas burden-shifting framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In the absence of direct evidence, the plaintiff, in order to show a causal connection between the adverse employment action and the protected activity, "must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct."   Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 381 (6th Cir. 2002) (quotation omitted).  A plaintiff can generally make this showing through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights . . . ." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted).  If the plaintiff establishes a prima facie case of retaliation, "the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  If the defendant is successful in rebutting the inference of retaliation, the plaintiff bears the ultimate burden of demonstrating by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination." Moon

10

v. Transp. Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987) (citation omitted).

Larkins

Larkins claims that GE attempted to extort from him information about his grand jury testimony.  He was apparently requested by GE's legal personnel to answer questions about the alleged fraud being perpetrated against the government.  At first, Larkins refused to answer GE's questions, but after being threatened with a possible suspension or termination of employment, he decided to cooperate.  During this interview, Larkins was not asked to reveal the testimony he gave before the grand jury.  Instead, GE asked questions similar to those posed by the grand jury, which Larkins contends is the equivalent of extorting his grand jury testimony.  Conversely, GE contends that it interviewed Larkins about the alleged fraud because GE was performing its own internal investigation into the matter.  It  interviewed many employees in the months prior to Larkins' interview.  Furthermore, GE contends that its interview was part of each employee's duty "to inform the company of any potential product safety, quality, or integrity issues known to them."  Because Larkins refused to comply with this duty, GE notified Larkins that he could be suspended or even terminated.  In other words, GE claims that it took these actions because it was performing its own internal investigation of the alleged fraud and Larkins refused to cooperate.  Larkins has put no evidence in the record to rebut GE's non-retaliatory reason for making such threats or for requiring Larkins to submit to an interview.  His claim cannot succeed due to this lack of evidence.

Larkins contends that a unit manager, Carl Schneider, harassed him because he was a federally protected grand jury witness.  In a Form A, Larkins describes his integrity concern regarding Schneider as follows: "1) Harassment of a federally protected grand jury witness (made a target due to the fact), 2) verbally assaulted, 3) physically threatened, 4) violation of workplace

11

violence zero tolerance, 5) conduct unbecoming of a unit manager . . . ." (Pls.' Ex. 16.)  Because Larkins cites to no other record evidence regarding this incident, it is unclear precisely what the harassment entailed.  But even if Larkins were able to establish that Schneider harassed him and that the harassment arose to the level of an adverse employment action, he has presented no evidence to establish that such action was taken in retaliation for Larkins engaging in a protected activity.

Larkins also claims that GE attempted to illegally lock him out of the GE facility in retaliation for his grand jury testimony.  Apparently Larkins had been out on sick leave and upon returning, he was not permitted to enter the GE facility and was told that he was being suspended pending a review of his time and attendance.  He does not remember when this incident occurred or which member of management told him that he was suspended.  He also does not recall whether, at the time of the incident, he had sufficient warnings related to time and attendance to warrant a suspension.  Larkins cites to the deposition testimony of Crowley, another GE employee, to support his claim.  But Crowley only testified that somebody in human resources told him to deactivate Larkins' badge.  Therefore, the only evidence of retaliation is that Larkins engaged in a protected activity and at some point after he engaged in the protected activity (over one year later), he was suspended, for at most, one week.  Missing from the record is any evidence that gives rise to an inference that GE suspended Larkins because he testified before the grand jury.

In addition to the above allegations of retaliation, Larkins also contends that he was suspended on various occasions in 2006 and 2007 in retaliation for testifying before the grand jury.  GE contends that these employment actions were taken in accordance with the company's policies related to time and attendance and such reasons were communicated to Larkins each time he was suspended.  Larkins cites to no record evidence to show that the non-retaliatory reasons proferred

12

by GE are, in fact, pre-text for retaliation.  Larkins acknowledges that he had accrued sufficient absences to warrant these actions under GE's time and attendance policy.  (Larkins Dep. vol. I, 179:3-11, Oct. 13, 2008.)  And although Larkins and his union do not agree with GE's policy, Larkins testified that "G.E. has [the policy], enforces [the policy], uses [the policy] . . . ." (Id. 179:1-2.)  These suspensions occurred three or more years after Larkins provided grand jury testimony; and he was suspended as any other employee would be suspended under GE's time and attendance policy.

<u>Crick</u>

Crick argues that he was given an internal traffic "citation" by GE security in retaliation for testifying before the grand jury.[7]  Apparently Crick was issued a citation on August 16, 2005 after another employee complained that Crick was traveling the wrong direction on a one-way road through GE's parking lot.  Crick cites to no additional evidence to suggest that the citation was issued against him for any reason other than that proferred by GE–that Crick violated the parking privileges and rules.

Crick also contends that his private health information was disclosed by GE personnel in retaliation for testifying before the grand jury.  After Crick developed a rash on his hands, he went to the in-house doctor who diagnosed the rash as scabies, a contagious infection.  Apparently, the contagious nature of his condition, but not the condition itself, was "passed to appropriate individuals on a need-to-know basis to ensure workplace safety."  (Pls.' Ex. 38 at 14.)  Crick does not suggest that these actions violated any law or that the information was released for any reason other than to ensure workplace safety.  GE's investigation did conclude, however, "that a contract

_____

[7]        Crick testified before the grand jury on June 8, 2005.

nurse that was filling in for another nurse that was not working may have told Mr. Crick's supervisor

that Mr. Crick should not participate in the blood drive because he would be on medication.  While

this is not overly sensitive data, it was determined with the site medical leader that a better practice

would be to leave a message for the employee to contact the clinic personally to receive this type

of information." (Id.)  As a result, GE required the fill-in nurse to complete a data privacy refresher

training.  (Id. at 14.)  But there is nothing in the record to suggest that any information about Crick

was released in order to retaliate against him.  The only evidence in the record indicates that any

improper release of medical information was a mistake on the part of a fill-in nurse who was not

even aware that Crick testified before the grand jury.

Boze

Boze contends that he was improperly paid for the period of time he spent testifying before

the grand jury.[8]  Apparently GE has a policy to pay employees their normal wages plus any night

shift bonuses for the time they are away from work pursuant to a subpoena.  GE paid Boze for the

two days he was excused pursuant to the subpoena, but it failed to pay his night shift bonus for those

days.  Once Boze informed GE of this error, his pay was immediately corrected.  None of the other

plaintiffs contend that they were improperly paid for the time they spent testifying before the grand

jury.  And Boze acknowledged in his Form A that other employees that testified before the grand

jury were properly paid.  His contention, then, that GE failed to pay him because he testified before

the grand jury is without merit.  The only evidence in the record supports GE's proferred

explanation–that the failure to properly pay Boze was the result of a clerical error.

_____

[8]      Boze testified before the grand jury on September 3, 2003, October 7, 2003, and April 15, 2005.

14

Boze also cites to a Form A[9] where he contends that GE denied him FMLA leave after he testified before the grand jury.  Assuming the Form A exists and contains the information represented by Boze, his claim still fails.  It is not enough for a plaintiff to show that he engaged in a protected activity and that at a later date, an adverse employment action was taken against him. Instead, he must additionally show that the employer took the adverse employment action because the employee engaged in the protected activity.  There is no such evidence here.

<u>Failure to Pay Wages for Time Spent Being Deposed</u>

The plaintiffs contend that GE initially paid them for the time they were deposed in this matter, but that they later deducted those wages from a future paycheck.  GE contends that it improperly paid Crick and Boze for the time they spent being deposed in this matter.  GE realized this error after Larkins, who was not paid for the time he spent being deposed, brought this pay discrepancy to GE's attention.  The plaintiffs do not contend that GE was obligated to pay them for this time.  Instead, they contend that deducting that pay from a later paycheck was retaliatory. However, there is no evidence of retaliation.  The only evidence is that GE deducted that pay at a later date because Larkins brought the clerical error to GE's attention.

<u>Guards Shadowing Larkins, Boze, and Crick</u>

The plaintiffs contend that GE assigned guards to follow them around the plant in order to spy on them in the workplace, and to monitor and log all of their activities.  GE contends that, although it did have a security detail follow the plaintiffs around the plant, it did so in order to ensure the plaintiffs' safety.  It is undisputed that on January 21, 2005, an article appeared in the

---

[9]     Boze cites to this Form A at Exhibit 43.  However, Exhibit 43 is Crick's subpoena to testify before the grand jury.  After a review of the record, it appears that Boze cites to this Form A in error and that such Form A is not part of the record.

local paper related to the plaintiffs' grand jury testimony.  It is also undisputed that the newspaper article created tension at the plant, that this tension made the plaintiffs concerned for their safety, and that they reported these safety concerns to GE.  As a result, the guards were assigned to the plaintiffs on January 25, 2005, just four days after the publication of the articles that created this tension at the worksite.  The plaintiffs argue that they never asked that security guards follow them around the plant.  Apparently the plaintiffs complained either to GE or to their union about the presence of the security guards.  And although the plaintiffs contend that assigning the security guards to "shadow" them was retaliatory, they also contend that the removal of the guards two to three weeks later was also retaliatory.

The plaintiffs' only evidence of pre-text is their belief that GE did not do enough to protect them or to investigate the threats.  But it is the plaintiffs' burden to establish that GE's proferred reason for having guards follow the plaintiffs around, i.e. to ensure the safety of the plaintiffs, is pretext for retaliation.  It is not enough to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, . . . and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (internal quotation and markings omitted).  Merely contending that GE could have done more to protect the plaintiffs or that it could have performed a more thorough investigation does not satisfy this burden.

16

The plaintiffs' claim of retaliation fails simply because many of the alleged employment decisions made by GE do not constitute adverse employment action and because the plaintiffs have failed to show a causal connection between the employment decisions and the protected activity. Accordingly, summary judgment in favor of GE is warranted.

## B. SUPPLEMENTAL STATE LAW CLAIMS

The plaintiffs have brought two supplemental state law claims against GE: intentional infliction of emotional distress and invasion of privacy. GE contends that it is also entitled to summary judgment as to these claims.

### 1. Intentional Infliction of Emotional Distress ("IIED")

The plaintiffs have asserted a claim for IIED alleging many of the same facts that make up their claim for retaliation. GE contends that the plaintiffs' claim for IIED, which is a gap-filler tort, fails because the plaintiffs' claim for retaliation would have provided adequate relief for any emotional distress suffered by the plaintiffs. The Court agrees with the defendant. Kentucky considers the tort of outrage to be a "gap-filler." Rigazzio v. Archdiocese of Louisville, 853 S.W.2d 295, 298-99 (Ky. Ct. App. 1993). This means that IIED is not a valid cause of action in Kentucky where the alleged conduct makes out a claim for another tort for which emotional distress damages are available. Id.; see also Banks v. Fritsch, 39 S.W.3d 474 (Ky. Ct. App. 2001) (holding that a directed verdict for defendant on IIED claim was proper where evidence did not support a finding that defendant intended only to cause plaintiff extreme emotional disturbance and plaintiff could theoretically recover emotional damages arising from false imprisonment, assault, or battery); Brewer v. Hillard, 15 S.W.3d 1 (Ky. Ct. App. 2000) (considering whether IIED claim should have been dismissed in favor of alternative and non-alleged assault and battery theories).

17

The result is that an IIED claim cannot be pled by itself, in tandem with another tort, or in the alternative as long as some other tort with adequate relief fits the facts. See Grace v. Armstrong Coal Co., No. 4:08-cv-109-JHM, 2009 WL 366239, at **3-4 (W.D. Ky. Feb. 13, 2009) (dismissing IIED claim where claims for defamation and wrongful discharge provided for emotional distress damages); Shouse v. Daviess County, No. 4:06CV-144-M, 2009 WL 424978, at *9 (W.D. Ky. Feb. 19, 2009) (dismissing IIED claim where constitutional claim under 42 U.S.C. § 1983 provided for emotional distress damages); Taylor v. Univ. Med. Ctr., Inc., No. 3:03CV-502-H, 2005 WL 1026190, at *3 (W.D. Ky. Apr. 26, 2005) (dismissing IIED as a gap-filler tort while simultaneously granting summary judgment on all other tort claims); Cissell v. KFC Corp., No. 2006-CA-001596-MR, 2007 WL 3227571, at *2 (Ky. Ct. App. Nov. 2, 2007) (affirming same). The sole exception is where the alleged "actions or conduct are intended *only* to cause extreme emotional distress in the victim." Brewer, 15 S.W.3d at 8 (emphasis added).

Here, the plaintiffs contend that GE created a hostile work environment. According to the plaintiffs, GE did so, not solely to inflict emotional distress upon the plaintiffs, but also to retaliate against them for assisting the government in its investigation and to discourage others from cooperating in the government's investigation. If the plaintiffs were able to prove these allegations, the FCA would allow them to recover for any emotional distress they suffered. Therefore, the plaintiffs cannot plead IIED "by itself, in tandem with another tort, or in the alternative" because their claim for retaliation provides adequate relief. Therefore, summary judgment as to this claim is appropriate.[10]

---

[10]     The plaintiffs contend that under the Court's analysis, a hypothetical plaintiff that was both assaulted by his employer and retaliated against by his employer in violation of the FCA would be precluded from asserting an assault claim. The Court disagrees. An assault claim can be pled

### 2. *Invasion of Privacy*

Lastly, the plaintiffs contend that GE invaded their privacy by spying on them outside of the workplace.  To succeed, the plaintiffs "must show (1) an intentional intrusion by the defendant, (2) into a matter the plaintiff[s] ha[ve] a right to keep private, (3) which is highly offensive to a reasonable person."  <u>Smith v. Bob Smith Chevrolet, Inc.</u>, 275 F. Supp. 2d 808, 822 (W.D. Ky. 2003).  As the Court similarly found in its discussion of retaliation, the plaintiffs have presented no evidence that GE hired the unknown person that followed them and spied on their families.  They only believe that this unknown person was hired by GE because they are not aware of anyone else that would be interested in their activities.  This belief is insufficient to create a genuine issue of material fact.  Because the plaintiffs cannot fulfill the first element of this claim–that there was an intentional intrusion *by the defendant*–summary judgment is appropriate.[11]

### IV.  CONCLUSION

For the reasons set forth above, the motions by the defendant, General Electric Company, for summary judgment [DN 26, 27, and 28] are **GRANTED** and its motions to strike [DN 35, 36, and 37] are **DENIED as moot**.  A judgment will be entered consistent with this Memorandum Opinion and Order.

cc:      Counsel of Record

in tandem with a claim for retaliation because, unlike IIED, assault is not a gap-filler tort under Kentucky law.

[11]      Because the Court finds that summary judgment in favor of GE is appropriate, GE's motions to strike are moot.